# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ESTATE MOTORS, INC., individually and on behalf of all those similarly situated,

    Plaintiff,

v.

MERCEDES-BENZ USA, LLC; MERCEDES-BENZ VANS, LLC; MERCEDES-BENZ U.S. INTERNATIONAL, INC.; DAIMLER NORTH AMERICA CORPORATION; DAIMLER AKTIENGESELLSCHAFT (DAIMLER A.G.); VOLKSWAGEN AKTIENGESELLSCHAFT (VOLKSWAGEN A.G.); VOLKSWAGEN GROUP OF AMERICA, INC.; AUDI AKTIENGESELLSCHAFT (AUDI A.G.); AUDI OF AMERICA, INC.; AUDI OF AMERICA, LLC; DR. ING. h.c.F. PORSCHE A.G.; PORSCHE CARS NORTH AMERICA, INC.; BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT (BMW A.G.); BMW(US) HOLDING CORP.; and BMW OF NORTH AMERICA, LLC;

    Defendants.

Civil Action No. _____

**<u>CLASS ACTION COMPLAINT</u>**

(JURY TRIAL DEMANDED)

Plaintiff Estate Motors, Inc. ("Estate Motors" or "Plaintiff") on behalf of itself and all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on continuing investigation, bring this action, in which class certification will be promptly sought, for damages and other relief pursuant to federal antitrust laws against the powerful members of the German motor vehicle manufacturing industry, whose brands, including, Audi, BMW, Daimler, Mercedes-Benz, MINI, Porsche, and Volkswagen, operate prominently in the United

States, and have a predominant position in the market for German and luxury motor vehicles. Plaintiff, by and through their attorneys, allege as follows:

## NATURE OF ACTION

1.      Plaintiff alleges a conspiratorial scheme among Defendant German automotive manufacturers and their American subsidiaries or affiliates, dating back to the early 1990s, *inter alia*, to limit competition, fix prices, and compress the profit margins of the automotive manufacturers' direct customers: the franchised dealerships through whom they distribute their motor vehicles to the consuming public in America.

2.      The members of the conspiratorial scheme operated as a cartel, and they are sometimes referred to herein as the "Antitrust Cartel."

3.      In addition to imported products manufactured outside the United States, this scheme also included the manufacture and distribution of new vehicles and parts by and through American subsidiaries and/or affiliates.

4.      Plaintiff and the proposed Class of franchised dealers compete among themselves and against franchised dealers who sell motor vehicles manufactured by other Original Equipment Manufacturers ("OEMs").

5.      The core factual allegations are direct and compelling, and, according to published reports, some of the conspiring Defendants have admitted illegal, collusive anticompetitive behavior spanning decades to antitrust authorities in Europe and the United States, misconduct constituting *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.      Material facts include events, sales and transport in and through interstate commerce, and interstate commerce is significantly and negatively affected by the misconduct of the Antitrust Cartel.

7.     Although certain of the actionable communications, coordination, collusion, decisions and actions were made or taken abroad, intended effects of those actions were directed toward, and had direct, substantial and reasonably foreseeable impacts on U.S. commerce, American dealers and the consuming public, as well as a significant impact on the United States, the largest motor vehicle market in the world, establishing *per se* violations of Section 1 of the Sherman Act.

8.     Although the overarching scheme described herein is remarkably simple and brazen in concept, the relevant facts transpired over decades, and implicated conspiratorial communications and actions by hundreds of actors.

9.     A partial summary of relevant facts includes the following:

a.    On July 22, 2017, German news magazine *Der Spiegel* reported a conspiracy of shocking depth, scope, duration and magnitude among members of Germany's powerful automotive industry;

b.    *Der Spiegel* reports that for at least two decades, hundreds of managers, executives and engineers of five large German automakers met routinely in approximately sixty different "task forces" or "working groups" to coordinate "development of their vehicles, costs, suppliers and markets" and that these automakers "secretly cooperate, very closely in the same way one would normally expect of the subsidiaries of a single company to work together, as something like a 'German Cars, Inc'." – or a cartel.  A true copy of the English-language version of the article, first published on July 22, 2017, and posted at http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html is attached hereto as <u>EXHIBIT A</u>;

c.    *Der Spiegel* reports that Defendants Daimler and Volkswagen have admitted participation in this price-fixing conspiracy and/or cartel to German and European Union antitrust officials, in an attempt to reduce their forthcoming punishment by racing to be the first cartel participant to self-report the unlawful activity;

d.    *Der Spiegel* quotes from what it reports as Volkswagen's brief to the European and German authorities that: "There is 'the suspicion,' as Volkswagen stated in its brief, also speaking on behalf of subsidiaries Audi and Porsche, that there was 'behavior in violation of cartel law'."  Volkswagen's submission to the European Commission is not yet available to the public;

e.   *Der Spiegel* reported that the collusive behavior, embracing myriad manufacturing details of the German automotive industry, included "more than 1,000 relevant meetings" over the last five years, according to Volkswagen's submission to European authorities;

f.   *Der Spiegel* reported that the subjects for the Antitrust Cartel included shared interests in costs and pricing;

g.   *Der Spiegel* reported that executives of the German manufacturers engaged in their cooperative meetings and conference calls with preset agendas and minutes, and "sometimes the participants even joked about the aspect of confidentiality. One Audi email, for example, allegedly states: 'Hello everyone, here is the information on the 'secret' meeting in Munich'.";

h.   In addition to *Der Spiegel*, numerous other outlets have reported, and continue to report, examples and incidents of Defendants *per se* unlawful, anti-competitive behavior.

10.   All the hallmarks of a conspiracy and/or cartel to fix, stabilize or coordinate prices are present in this case:

a.   The members of the Antitrust Cartel frequently provided each other with competitively-sensitive company information, of a type not expected to be shared by companies in actual competition;

b.   The nature, quantity and strategic importance of the information that was communicated was pervasive and voluminous;

c.   The oral communications occurred behind closed doors, not in public;

d.   All communications were to be held in secret by the participants in the Antitrust Cartel;

e.   The information was detailed and specific, not generalized, which facilitates coordination;

f.   The communications related to "markets" prices, volumes and individual information;

g.   The information was current and/or related to future behavior – it was not stale or historic;

h.   The direct communications were frequent and occurred over many years, if not decades;

i.   The direct communications involved senior executives;

j.  The members of the Antitrust Cartel failed to impose adequate oversight and safeguards to prevent collusive behavior; indeed, collusive behavior was a purpose of the Antitrust Cartel.

11.     This putative class action is brought against the following Defendants and named and unnamed co-conspirators for agreeing to share commercially-sensitive information and reach unlawful agreements regarding the pricing, costs, markets, technology, suppliers, emissions, equipment and other competitive attributes in violation of United States antitrust laws, thereby causing injury to Plaintiff and the Class (defined below):

a.  Audi Aktiengesellschaft ("Audi A.G."); Audi of America, Inc.; and Audi of America, LLC (together, "Audi");

b.  Bayerische Motoren Werke Aktiengesellschaft ("BMW A.G."); BMW(US) Holding Corp. and BMW of North America, LLC (together, "BMW")[1];

c.  Daimler North America Corporation and Daimler Aktiengesellschaft ("Daimler A.G.") (together, "Daimler");

d.  Mercedes-Benz U.S. International, Inc.; Mercedes-Benz USA, LLC; and Mercedes-Benz Vans, LLC (together, "Mercedes-Benz");[2]

e.  Dr. Ing. h.c.F. Porsche A.G.; and Porsche Cars North America, Inc. (together, "Porsche");

f.  Volkswagen Aktiengesellschaft ("Volkswagen A.G."); and Volkswagen Group of America, Inc.; (together, "Volkswagen").[3]

---

[1] The various BMW defendants are subsidiaries and/or affiliates of defendant BMW A.G.

[2] The various Mercedes-Benz defendants are subsidiaries and/or affiliates of defendant Daimler North America Corporation, which is an affiliate and/or subsidiary of defendant Daimler A.G.

[3] The various Volkswagen defendants, Audi defendants, and Porsche defendants are subsidiaries and/or affiliates of Defendant Volkswagen A.G.

12.     The Defendants listed in paragraphs 11(a) through (f) are sometimes referred to collectively herein as "Defendants" or the "Antitrust Cartel".

13.     The nature of the German motor vehicle industry, which the above-identified Defendants collectively dominate, virtually to the exclusion of any other competitors, facilitated the conspiratorial and collusive anti-competitive activities described herein.

14.     Specifically, the German motor vehicle industry has the following characteristics, all of which make it highly prone to collusive schemes to emerge, be sustained and cause market-wide impact:

a.  The Defendants have very high combined market shares of the German motor vehicle industry;

b.  The Defendants had completely aligned interests in maintaining high market shares and the highest possible prices;

c.  The barriers to entry in the German motor vehicle market protect cartel behavior;

d.  The absence of competitive substitutes enhanced cartel stability and duration;

e.  The prominence and importance of the German motor vehicle industry to Germany's economy and that of the broader European Union facilitated coordination and protected cartel behavior;

f.  Similar production technologies and common suppliers facilitated coordination among the Defendants;

g.  Symmetry among Defendants facilitates coordination, because all Defendants share similar aims in technology and costs, the types of customers they satisfy, and the worldwide markets in which they operate.

15.     German motor vehicles and parts are reputed to be among the best-engineered vehicles in the world; they command premium price levels in the marketplace and are associated with a high level of prestige and luxury.

16.    German motor vehicles and parts are distinct from those manufactured by competitors, and the Defendants have spent many millions of dollars advertising and trumpeting the virtues of German engineering and quality.

17.    Each Defendant knows and understands that their closest competitors among U.S. consumers are the other Defendants.

18.    This common design is demonstrated by the Defendants' practice of establishing franchised dealerships in close proximity to each other.

19.    The franchised dealerships are the United States' retail outlets for the Defendants' motor vehicles, parts and service, as the dealers are Defendants' direct wholesale customers.

20.    Consumer preference for German motor vehicles and parts indicates cohesiveness; second-choice surveys of German motor vehicle purchases consistently show that consumers who purchased German motor vehicles would have purchased from another member of the Antitrust Cartel.

21.    Upon information and belief, Defendants limited manufacturer membership in the Antitrust Cartel to the companies controlled by the three families of German motor vehicle companies: the Volkswagen Group, the BMW Group and the Daimler Group.

22.    Upon information and belief, during the Class Period, Defendants rejected requests from other European, but non-German, motor vehicle manufacturers such as Jaguar, Volvo, Renault, and Fiat to join their exchange of information.

23.    Upon information and belief, no non-German manufacturer was invited into the Antitrust Cartel, and no other significant German motor vehicle manufacturer competed in any material way in U.S. sales during the Class Period.

24.    Due to their unique place in the U.S. market, brand equity, marketing campaigns, and reputation for German engineering, German motor vehicles and parts are price inelastic, relative to motor vehicles and parts produced by competitors.

25.    The price inelasticity allows Defendants to demand premium wholesale prices from Plaintiff and members of the Class, which is exacerbated because Defendants have shared cost information and price sensitive information with one another.

26.    Due to the conspiracy alleged herein, the normal pace of innovation was replaced by cartel-dictated staging.

27.    The artificially inflated wholesale premiums Plaintiff and members of the Class paid are supracompetitive because the Defendants used their market power to suppress competition.

28.    In coordinated time frames, between a time to be determined, but on information and belief, in the 1990s, and upon information and belief, in or about 2017, Defendants cooperatively raised and/or sustained wholesale prices at which they sell motor vehicles and parts to franchised dealers in America.

29.    The conspiracy alleged herein was of a continuing nature which ended – if it ended – only recently and, upon information and belief, in 2017, if at all.

30.    Collusion, namely through price fixing or price stabilization, is expected to decrease the differences in prices among colluders, in comparison to prices in the absence of collusive behavior.

31.    As a result of the Antitrust Cartel's collusion and conspiracy, together with their actions and decisions taken under the unlawful scheme, Plaintiff and the Class Members paid artificially inflated wholesale prices for motor vehicles and parts, while the manufacturers'

suggested retail prices were not raised correspondingly with the inventory pricing charged to dealers.

32.    As a result, Plaintiff and the Class Members:  (a) paid coordinated increased and/or sustained prices for vehicles and parts inventories; and (b) experienced dramatically compressed profit margins.

33.    The impact of the Antitrust Cartel's scheme on franchised dealers in the United States has been, and will be, enormous: in 2016 alone, Defendants combined wholesaled more than 1.3 million motor vehicles to American dealers in the United States, that were retailed to end-using consumers.

34.    The Volkswagen group alone, which includes the Audi, Porsche and Volkswagen brands, sold close to 600,000 motor vehicles.[4]

35.    At the same time, the Antitrust Cartel and each of its members profited greatly from its decades-long scheme.

36.    By numbers of new units manufactured annually, Germany is the world's fourth largest motor vehicle producer, and its highly concentrated motor vehicle industry wields enormous political and financial power and influence within Germany and Europe.

37.    For purposes of antitrust analysis, there are three independent manufacturers in the German motor vehicle industry, operating through a number of brands: the group owned by Daimler A.G., operating as Daimler and as Mercedes-Benz (the "Daimler Group"); the group owned by BMW A.G., operating as BMW and MINI (the "BMW Group"); and the group owned by Volkswagen A.G., operating as Volkswagen, Audi, Porsche, and numerous other brands (the

---

[4] Source:  Automotive News Data Centers, as reported at http://www.goodcarbadcar.net/2017/01/december-2016-usa-auto-sales-brand-results.html.

"Volkswagen Group").   As a result, the industry for the aforementioned vehicles is highly concentrated.

38.    Plaintiff seeks to represent all franchised dealers that represent brands of any of the Defendants ("German Vehicles") in the United States from at least as early as January 1, 1990 through such time as the anti-competitive effects of the Defendants' conduct ceased (if, indeed, they have ceased) (the "Class Period") which have suffered harm as a result of Defendants' anti-competitive and unlawful collusive behavior.

## JURISDICTION AND VENUE

39.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation, because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26).

40.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from any Defendant.

41.    Venue is proper in this District because Defendants reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391 (b) and (c) and in Section 4 of the Clayton Act, 15 U.S.C. § 15.

42.    A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including without limitation: the location of BMW's North American headquarters in Woodcliff Lake, New Jersey, and until recently, Mercedes-Benz's U.S.

headquarters location in Montvale, New Jersey (where a large regional office continues to operate).

43.     All Defendants do business in and sell motor vehicles in the State of New Jersey; and the Defendants operating through their American subsidiaries have registered to do business in the State of New Jersey.

44.     This Court has personal jurisdiction over Defendants because each, directly and/or through ownership and/or control of their subsidiaries and/or affiliates, *inter alia*: (a) transacted business throughout the United States in interstate commerce, including in this District; (b) manufacture and sell substantial numbers of motor vehicles; (c) market parts, service contracts, extended warranties, motor vehicle financing and participate in other business activities throughout the United States, including in this District; (d) have substantial aggregate contacts within the United States, including in this District; and (e) are or were engaged in an illegal anti-competitive scheme, collusion and conspiracy in restraint of trade that was directed at, and had a substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities, including franchised motor vehicle dealers, residing in, located, in, and/or doing business throughout the United States, including in this District.

45.     Defendants conduct business throughout the United States in interstate commerce, including in this District, and have purposefully availed themselves of the laws of the United States.

46.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are wholesaled and retailed in the flow of interstate commerce.

47.     Motor vehicles and parts manufactured abroad and in the United States by Defendants and sold in the United States are goods brought into and/or made in the United States for sale, and therefore constitute international and interstate commerce.

48.     The Antitrust Cartel's anti-competitive conduct, and its effect on commerce in the United States, as described herein, proximately caused antitrust injury to Plaintiff and Class Members in the United States.

49.     Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class, as well as to the consuming public.

50.     Defendants, directly and through their agents, engaged in anticompetitive activities affecting all states, as they coordinate activities related to markets, design and manufacture, pricing, parts, supplier selection, establishment of manufacturer selected retail prices (MSRPs), and franchise practices.

51.     Defendants' conspiracy and anticompetitive conduct described herein caused franchised dealers in the United States, the direct customers of the Defendants, to pay unlawfully inflated prices for the motor vehicles and parts they purchased from Defendants.

52.     Defendants' conspiracy and anticompetitive conduct assured that the Plaintiff and Class Members could not recoup their antitrust damages in resale or otherwise.

53.     At all times, Defendants in the Antitrust Cartel participated in a continuous conspiracy and they endeavored mightily to maintain secrecy which they did until recent disclosure.

54.     The monetary harm to affected American dealers is in an amount to be determined at trial, but is certainly in the many billions of dollars.

**THE PARTIES**

55.    The Plaintiff is a New York corporation and was a franchised dealer of new Mercedes-Benz vehicles and parts from 1967 until April, 2017.

56.    For about fifty years, Plaintiff was a franchised Mercedes-Benz dealer that served the New York, New Jersey and Connecticut Tri-State area and it sold and serviced, *inter alia*, new and used Mercedes-Benz motor vehicles, as well as parts.

57.    At all relevant times, Plaintiff operated its franchised business pursuant to a dealer agreement.

58.    The dealer agreement is a contract of adhesion that is drafted solely by Mercedes-Benz with little or no input from the Plaintiff and this characteristic of dealer agreements applies to the agreements of all Defendants.

59.    As a franchised dealer, Plaintiff was a direct customer of Mercedes-Benz.

60.    At all relevant times, Plaintiff purchased, at uniform wholesale prices, the motor vehicles and parts that were ultimately retailed to consumers.

61.    Defendant Volkswagen Aktiengesellschaft ("Volkswagen A.G.") is a German corporation with its headquarters located at VW-Straße 103, 38440 Wolfsburg, Germany.

62.    Defendant Volkswagen Group of America, Inc. is a New Jersey corporation with its headquarters located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171, and is a wholly owned subsidiary of Volkswagen A.G.

63.    Defendant Audi A.G. is a German company with its headquarters located at Auto-Union-Straße 1, 85045 Ingolstadt, Germany, and is a wholly owned subsidiary of Volkswagen A.G.

64.    Defendant Audi of America, Inc. is a New Jersey corporation with its headquarters located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171, and is a wholly

owned subsidiary of Volkswagen Group of North America, Inc., which in turn is a wholly owned subsidiary of Volkswagen A.G.

65.    Defendant Audi of America, LLC is a Delaware limited liability corporation with its headquarters located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171, and is a wholly owned subsidiary of Volkswagen Group of North America, Inc., which in turn is a wholly owned subsidiary of Volkswagen A.G.

66.    Defendant Dr. Ing. h.c.F. Porsche A.G. is a German company with its headquarters located at Porscheplatz 1, D - 70435 Stuttgart, Germany, and is a wholly owned subsidiary of Volkswagen A.G.

67.    Defendant Porsche Cars North America, Inc. is a Delaware corporation with its headquarters located at 1 Porsche Drive, Atlanta, Georgia 30354, and is a wholly owned subsidiary of Dr. Ing. h.c.F. Porsche A.G., which in turn is a wholly owned subsidiary of Volkswagen A.G.

68.    Defendant Daimler A.G. is a German company, with its headquarters located at Mercedesstr. 137, 70327 Stuttgart, Germany.

69.    Defendant Daimler North America Corporation is a Delaware corporation with its headquarters located at 36455 Corporate Drive, Farmington Hills, Michigan 48331, and is a wholly owned subsidiary of Defendant Daimler A.G.

70.    Defendant Mercedes-Benz U.S. International, Inc. is an Alabama Corporation with its headquarters located at 1 Mercedes Drive, Vance, Alabama 35490, and is a wholly owned subsidiary of Defendant Daimler North American Corporation, which in turn is a wholly owned subsidiary of Defendant Daimler A.G.

71.     Defendant Mercedes-Benz USA, LLC is a Delaware corporation with its headquarters located at 303 Perimeter Center N., Atlanta, Georgia 30346, and is a wholly owned subsidiary of Defendant Daimler North American Corporation, which in turn is a wholly owned subsidiary of Defendant Daimler A.G.

72.     Defendant Mercedes-Benz Vans, LLC is a Delaware Corporation with its headquarters located at 8501 Palmetto Commerce Pkwy, Ladson, South Carolina 29456, and is a wholly owned subsidiary of Defendant Daimler North American Corporation, which in turn is a wholly owned subsidiary of Defendant Daimler A.G.

73.     Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW A.G.") is a German Corporation in Germany, with its headquarters located at Petuelring 130, 80788 München, Germany.

74.     Defendant BMW(US) Holding Corp. is a Delaware corporation company with its headquarters located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677, and is a wholly owned indirect subsidiary of Defendant BMW A.G.

75.     Defendant BMW of North America, LLC is a Delaware corporation with its headquarters located at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677, and is a wholly owned subsidiary of BMW (US) Holding Corp., which in turn is a wholly owned indirect subsidiary of Defendant BMW A.G.

## FACTUAL ALLEGATIONS

### I.     The Defendants' Anticompetitive and Illegal Conspiracy

76.     Since at least the 1990s, through their Antitrust Cartel, Defendants that compete horizontally have shared commercially-sensitive information including, *inter alia*, costs, cost

factors and prices, and reached unlawful agreements regarding German Vehicle technology, costs, pricing, suppliers, markets, parts, emissions equipment and other competitive attributes.

77.     Defendants' purposes, *inter alia*, included fixing, maintaining, stabilizing, manipulating, and otherwise directing prices among rivals for businesses that compete horizontally.

78.     In or about July 2017, and upon information and belief, Defendant Volkswagen A.G. made a voluntary disclosure to Germany's federal cartel office, the Bundeskartellamt, and the European Commission, admitting "involvement in presumptive antitrust violations," and upon information and belief, Defendant Daimler A.G. has also made a voluntary disclosure to the same authorities.

79.     Daimler A.G. has not publicly commented on the allegations reported by *Der Spiegel*, except to say, "Insofar as violations of antitrust law might have occurred, as a matter of principle, Daimler A.G. cooperates openly and transparently with the responsible authorities."

80.     Under relevant German and European law, the first of several antitrust conspirators to "come clean" by reporting antitrust violations to the authorities may be entitled to leniency in the form of greatly reduced sanctions.

81.     The Antitrust Cartel's conspiracy has prompted competition authorities from multiple jurisdictions, including, upon information and belief, the United States Department of Justice, to review Defendants' unlawful conduct.

82.     In the last five years alone, Defendants shared competitively sensitive information through at least 60 working groups and over 1,000 meetings.

83.     These contacts involved hundreds of Defendants' employees, including some at the highest levels of the companies.

84.     Defendants and their co-conspirators had and took multiple opportunities, in part through the meetings, conversations and communications described above, to discuss pricing, costs, markets, technology, suppliers, emissions, equipment and other competitive attributes relating to their motor vehicles, including in the United States.

85.     On July 22, 2017, the European Commission ("EC"), which is part of the European Union ("EU")[5] announced publicly that it was reviewing allegations of an antitrust cartel among a group of major German Vehicle manufacturers including Defendants Volkswagen A.G. and its subsidiaries, affiliates and/or brands Volkswagen, Audi, Porsche; Daimler A.G. and its subsidiaries, affiliates and/or brands Mercedes-Benz and Smart; and BMW and its subsidiaries, affiliates and/or brands BMW and MINI.

86.     European antitrust officials, the EC and its German counterpart, the Bundeskartellamt, have all confirmed receipt of information from Defendants that may relate to the operation of an antitrust cartel dating from the 1990s.

87.     As part of its review, the EC has confiscated documents from Defendants and interviewed witnesses in connection with the alleged cartel.

88.     According to Volkswagen's admissions to German antitrust officials, as reported by *Der Spiegel*, the Antitrust Cartel entered into potentially unlawful agreements regarding "vehicle development, brakes, petrol and diesel engines, clutches and transmissions as well as exhaust treatment systems."

89.     Upon information and belief, *Der Spiegel*'s reporting is based, *inter alia*, on its review of Volkswagen A.G. documents submitted to the German and EC authorities in the company's bid for leniency.

---

[5] The EU is comprised of 28 member-states, and includes Germany.

90.    In a follow-up article, *Der Spiegel* reports that EC Competition Commissioner Margrethe Vestager's office is reviewing the antitrust accusations against Defendants "with priority".[6]

91.    In the same article, *Der Spiegel* further reports that if European officials determine Defendants violated the antitrust laws in Europe, Defendants can be fined up to 10% of their global revenues from the previous year, which, "[f]or the year 2016, for the Volkswagen Group, including Audi and Porsche, as well as Daimler and BMW, this would amount to 465 billion euros," or approximately one-half trillion American dollars.

92.    The United States Department of Justice's Antitrust Division confirmed on July 25, 2017 that it is also reviewing the matter.[7]

## II.    Impact of the Antitrust Cartel's Illegal Behavior on Plaintiff and the Class

93.    Plaintiff and the absent members of the putative Class are franchised motor vehicle dealers that carry one or more of Defendants' brands.

94.    As such, they have contractual rights and obligations to distribute the vehicles manufactured and sold by the Defendants, and there is only one source of the merchandise they sell.

95.    Each franchised dealer *must* buy its new branded products from the Original Equipment Manufacturer ("OEM") of which it is a franchisee – for example, there is only one source of new BMWS: BMW itself, through its American subsidiaries and/or affiliates.

96.    The franchise relationship arises out of a bargaining imbalance with the OEMs that leaves franchised dealers even more vulnerable to anticompetitive, collusive behavior by

---

[6] 'Made in Germany' Label Badly Damaged by Car Scandal, August 4, 2017.  http://www.spiegel.de/international/ germany/the-end-of-a-legend-made-in-germany-label-sours-as-car-scandal-rages-a-1161376-2.html

[7] U.S. is Said to Review allegations German Carmakers Colluded, July 25, 2017. https://www.bloomberg.com/news/articles/2017-07-25/u-s-is-said-to-review-allegations-german-carmakers-colluded

Germany's powerful motor vehicle manufacturers, than are end-using consumers who can choose among all brands and makes.

97.    Unlike consumers, who can canvass the market and buy, for example a Ford or Toyota instead of an Audi, franchised dealers do not have the freedom to buy vehicles or parts other than from their OEM franchisor.

98.    Dealer Agreements – the agreements between dealers and their franchisors – are classic adhesion agreements, because the franchisors maintain extraordinary one-sided bargaining power and control.

99.    Franchised dealers are, quite literally, the direct customers of the OEMs – they buy, at uniform wholesale prices, the motor vehicles that are ultimately retailed to consumers, and the revenues the OEMs receive for vehicles and parts is paid by dealers.

100.    With rare exceptions, consumers do not pay anything directly to the OEMs – the dealers do.

101.    Therefore, due to the Antitrust Cartel's scheme of anticompetitive, collusive, conspiratorial and illegal activities, Plaintiff and the Class were deprived of the benefit of a competitive market, and forced to pay artificially inflated wholesale prices for the motor vehicles and parts they purchased from the OEMs.

102.    The damages suffered by Plaintiff and the members of the Class include, without limitation, the per-vehicle and per-part difference in price the Plaintiff and Class members paid to purchase vehicles and parts from Defendants compared to what the prices would have been in a healthy, non-collusive, competitive, and legal market for the Defendants' vehicles and parts.

103.    Damages also include increased finance and insurance costs, which are based upon the aggregate value of the dealers' inventories, which aggregate values have been artificially inflated.

104.    Plaintiff has also suffered, or will suffer, damage from harm to the brands it represents as a result of the Antitrust Cartel's anticompetitive collusion and illegal price fixing activities.

### III.    Defendants' Coordinated Manipulation of Their Wholesale Pricing Models

105.    Within a more-than-two-decade period, which ended in 2017, if then, Defendants from time to time materially raised wholesale prices they charged Plaintiff and the Class Members, while not raising applicable Manufacturer Suggested Retail Prices ("MSRPs") by similar amounts.

106.    This manipulation had the effect of constraining, squeezing or compressing Plaintiff's and the dealer Class members' profit margins, in many instances to the point where dealers were not able to turn a profit at all without eligibility for bonuses from the manufacturer. As but one example, Audi's bonus program illustrates the economic stranglehold Defendants exerted over Plaintiff and the Class.

- Audi offers its dealers a "Standards Bonus," which is based in part on a percentage of the manufacturer's suggested retail price for each vehicle sold.

- For exclusive Audi-branded dealers, upon information and belief, the Standards Bonus is 3.75% of the adjusted MSRP for each vehicle they sell.

- Dealers must often expend enormous outlays, frequently millions of dollars, to maintain bonus eligibility.

- Dealers who do not achieve the Standards Bonus are also ineligible to earn Audi's Top Performer Bonus.

107.    Audi's bonus program is not unique among Defendants; all of the Defendants moved to a similar framework in past and recent years, when they raised their wholesale prices and placed more emphasis on bonus programs, which OEMs use as a tool to exert leverage and control over Plaintiff and the Class members.

108.    Upon information and belief, Defendants coordinate their impact on their dealer networks when they raise their wholesale prices in consistent time frames, and place emphasis on bonus programs for dealers to maintain and/or achieve profitability.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this action on behalf of itself and as a proposed class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure seeking damages, and equitable and injunctive relief on behalf of the following class (the "Class"):

> All franchised motor vehicle dealers branded as Audi, BMW, Daimler, Mercedes-Benz, MINI, Porsche, and/or Volkswagen that purchased German Vehicles in the United States directly from one or more Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) during the Class Period.

110.    Excluded from the Class are the Defendants, their parent companies, subsidiaries and affiliates; any co-conspirators and/or their employees; federal governmental entities and instrumentalities of the federal government; states and their subdivisions, agencies and instrumentalities; any dealer in which any of Defendants has an ownership interest of any kind; and any person or entity who makes a timely election to be excluded from the Class.

111.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

112.    This action has been brought and may be properly maintained on behalf of the Class under Federal Rule of Civil Procedure 23.

113.    <u>Numerosity</u>:  Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of the Class are so numerous and geographically dispersed that individual joinder of Class members is impracticable.

114.    Plaintiff is informed and believes that there are more than 1,000 members of the Class.

115.    The precise number of Class members is unknown to Plaintiff, but may be ascertained from Defendants' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

116.    <u>Commonality and Predominance</u>:  Pursuant to Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3), this action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants designed, advertised, marketed, manufactured, distributed, leased, sold or otherwise placed vehicles into the stream of interstate commerce in the United States;

c. Whether Defendants colluded, cooperated or otherwise engaged in anticompetitive price-fixing in violation of the Clayton Act, and how long Defendants have engaged in such behavior;

d. Whether Defendants colluded, cooperated or otherwise engaged in anticompetitive price-fixing in violation of the Sherman Act, and how long Defendants have engaged in such behavior;

e. Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to the business or property of Plaintiff and the other Class members;

f. Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and other Class members;

g. Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

h. Whether Plaintiff and the other Class members are entitled to compensatory, punitive, treble, or other damages, and/or attorneys' fees, and if so, in what amount; and

i. The appropriate class-wide measure of damages.

117. <u>Typicality</u>: Plaintiff's claims are typical of the other Class members' claims under Federal Rule of Civil Procedure 23(a)(3) because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

118. Class members entered into substantially familiar dealer agreements with Defendants.

119.    Adequacy:  Plaintiff is an adequate Class representative under Federal Rule of Civil Procedure 23(a)(4) because its interests do not conflict with the interests of the other members of the Class it seeks to represent.

120.    Plaintiff has retained counsel competent and experienced in complex class action and antitrust litigation; and Plaintiff intends to prosecute this action vigorously.

121.    The Class' interests will be fairly and adequately protected by Plaintiff and their counsel.

122.    Declaratory and Injunctive Relief:  Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

123.    Superiority:  Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

124.    It would be impracticable for the members of the Class to individually seek redress for Defendants' wrongful conduct.

125.    Even if Class members could afford individual litigation, the court system could not.

126.    Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.

127.    By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## **FRAUDULENT CONCEALMENT**

128.    Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class for a period of at least twenty-five years, lasting through at least July 25, 2017, when the antitrust reviews or investigations of German Vehicle manufacturers became public.

129.    During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence.

130.    Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least July 25, 2017.

131.    Defendants' and their co-conspirators' successful contract, cartel, combination, and/or conspiracy was by its nature inherently self-concealing.

132.    Defendants and their co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

133.    In particular, Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss price-fixing and competitively sensitive information that affected customers in the United States and elsewhere.

134.    During these secret meetings, conversations, and communications, Defendants and their co-conspirators agreed upon prices and/or price sensitive strategies affecting customers in the United States and elsewhere.

135.    As a result of their secret coordinated actions, and unbeknownst to Plaintiff and the Class, Defendants and their co-conspirators sold German Vehicles and parts to dealers in the United States at collusive and supra-competitive prices.

136.    Despite due diligence, Plaintiff had no knowledge of Defendants and their co-conspirators' unlawful contract, combination, or conspiracy.

137.    Plaintiff had no way to know that the pricing information and prices received from one or more of Defendants or their co-conspirators were higher than they should have been due to the conspiracy alleged herein.

138.    Plaintiff did not and could not have discovered Defendants and their co-conspirators' unlawful agreement or conspiracy at any earlier date, despite due diligence.

139.    Defendants and their co-conspirators undertook affirmative acts of concealment of their contract, cartel, combination, and/or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiff and the Class of the reasons for the prices charged, and engaging in secret conversations concerning the price-fixing of German Vehicles.

## ANTITRUST ALLEGATIONS

140.    The Antitrust Cartel's contract, combination, collusion and conspiracy described herein consisted of a horizontal agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, inflate, maintain and/or stabilize prices paid by and received from Plaintiff and Class members for the purchase of motor vehicles and parts from Defendants in the United States, its territories and possessions.

141.    Frequently, the co-conspirators composing the Antitrust Cartel themselves refer to the participants in their anticompetitive scheme as a "cartel".

142.    In formulating and effectuating the contract, combination or conspiracy, the Antitrust Cartel members did what they unlawfully combined and conspired to do, including, *inter alia*:

26

    a.   Agreeing to artificially fix, inflate, maintain and/or stabilize prices paid by and received from Plaintiff and Class members for the purchase of motor vehicles and parts from Defendants in the United States, its territories and possessions; and

    b.   Implementing and monitoring the conspiracy among cartel members.

143. Upon information and belief, no member of the Antitrust Cartel ever withdrew from it.

144. Defendants and their co-conspirators have engaged in the activities described above for the purpose of effectuating the unlawful express or tacit agreement to artificially fix, inflate, maintain and/or stabilize prices paid by, and received from, Plaintiff and Class members for the purchase of motor vehicles and parts from Defendants in the United States, its territories and possessions.

145. Defendants knew and intended that their pricing and price-related actions regarding their sales of German Vehicles and parts would have a direct impact on prices for German Vehicles and parts for all direct purchasers of German Vehicles and parts throughout the United States.

146. Defendants' business activities had a substantial effect on interstate commerce, and Defendants' activities involve a substantial amount of interstate commerce.

147. Defendants' actions and scheme constitute an unreasonable restraint of trade.

148. Defendants' actions and scheme were deliberately concealed and highly secret, and Plaintiff had no knowledge or way to acquire knowledge of Defendants' actions before publication of *Der Spiegel's* report in July 2017.

## CLAIM FOR RELIEF

### FIRST COUNT
### *PER SE* VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
### (Against All Defendants)

149.    Plaintiff realleges and incorporates by reference each allegation set forth in all of the preceding paragraphs of this Complaint.

150.    Throughout the Class Period, and continuing through the commencement of this case, Defendants and their co-conspirators, all members of the Antitrust Cartel, have knowingly engaged, and continue to engage, in a contract, combination and conspiracy, through their express or tacit agreement to artificially fix, inflate, maintain and/or stabilize prices paid by and received from Plaintiff and Class members for the purchase of motor vehicles and parts from Defendants in the United States, its territories and possessions, and otherwise unreasonably restrain competition in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

151.    Defendants' combination and conspiracy has produced and, unless restrained, will continue to produce, the following anti-competitive effects, among others:

a.    competition in the wholesale pricing models for motor vehicles and parts purchased from Defendants by Plaintiff and Class Members has been and will continue to be unreasonably restricted and artificially eliminated and/or reduced; and

b.    Class Members have been and will continue to be deprived of the benefits of competition as to the wholesale pricing for motor vehicles and parts purchased from Defendants by Plaintiff and Class Members.

152.    As a direct and proximate result of Defendants' actions, Plaintiff and the members of the Class have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined and the consuming public would also continue to suffer material harm.

153.    Defendants' abridgement of Class members' economic rights are a naked, *per se* restraint of trade.

154.    Defendants' business activities had a substantial effect on interstate commerce, and Defendants' activities involve a substantial amount of interstate commerce.

155.    Damages suffered by Plaintiff and the members of the Class have not yet been ascertained, but are believed to be in the many billions of dollars.

156.    Pursuant to Section 4 of the Clayton Act, Plaintiff is entitled to recover from Defendants treble the amount of actual damages in addition to an award of reasonable attorneys' fees and costs of suit.

157.    Plaintiff and the Class are entitled to a permanent injunction that enjoins Defendants from engaging in the ongoing violations described in this Complaint.

158.    Plaintiff and the Class are further entitled to relief in the form of appointment of an External Antitrust Compliance Monitor.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the absent members of the Class pray for judgment against Defendants, jointly and severally, and respectfully requests the following relief:

A.    For class certification under Federal Rule of Civil Procedure 23, with Plaintiff as the designated Class representative and their counsel as Class Counsel;

B.    For a finding that the contract, combination or conspiracy, and the acts performed in furtherance of thereof by Defendants and their co-conspirators as alleged herein, constituted a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    For finding that the Defendants engaged in *per se* anti-competitive conduct herein alleged, at great harm to the Plaintiff and absent Class members;

D.      For actual damages according to the proof at trial or otherwise;

E.      For treble damages pursuant to 15 U.S.C. § 15;

F.      For an injunction restraining Defendants from future anticompetitive behavior, price fixing, collusion and restraint of trade;

G.      For Plaintiff's reasonable attorneys' fees, costs and expenses;

H.      For an pre-judgment and post-judgment interest in accordance with law;

I.      For such other relief that the Court may deem just and equitable; and

J.      For the appointment of an External Antitrust Compliance Monitor.

## DEMAND FOR JURY TRIAL

Plaintiff on behalf of itself and all others similarly situated hereby requests a jury trial on any and all claims so triable.

DATED: October 16, 2017

_____
Eric L. Chase
Ronald J. Campione
BRESSLER, AMERY & ROSS, P.C.
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
*echase@bressler.com*
*rcampione@bressler.com*

Attorneys for Plaintiff

Of Counsel:

Donald C. Klawiter, Esq.
KLAWITER PLLC
2101 L Street, NW, Suite 800
Washington, DC 20017
(202) 468-5222
*don.klawiter@gmail.com*
(*pro hac vice* motion to be filed)

William A. Kershaw, Esq.
KERSHAW, COOK & TALLEY
401 Watt Avenue, Suite 1
Sacramento, CA 95864
(916) 318-5891
*Bill@KCTlegal.com*
(*pro hac vice* motion to be filed)

## CERTIFICATION PURSUANT TO LOCAL CIV. RULE 11.2

The matter in controversy in this matter is the subject of other actions pending in the following courts:

*Audubon Imports, LLC v. Bayerische Motoren Werke AG, et al.,* Civ. Action No. 7-cv-01127, United States District Court for the Eastern District of Virginia; and

*In re German Automotive Manufacturers Antitrust Litigation,* MDL No. 2796, United States District Court for the Northern District of California.

DATED:  October 16, 2017

Eric L. Chase
Ronald J. Campione
BRESSLER, AMERY & ROSS, P.C.
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
*echase@bressler.com*
*rcampione@bressler.com*

Attorneys for Plaintiff

4057923

# EXHIBIT A

# SPIEGEL ONLINE

07/27/2017 02:10 PM

**The Cartel**

## Collusion Between Germany's Biggest Carmakers

By Frank Dohmen and Dietmar Hawranek

**The diesel scandal is not a failure on the part of individual companies, but rather the result of collusion among German automakers that lasted for years. Audi, BMW, Daimler, Volkswagen and Porsche coordinated their activities in more than a thousand meetings. The exposure of a cartel.**

Sometimes big things are hidden behind much smaller things. For instance, one of the biggest secrets of the German automotive industry lies behind the mechanism that opens and closes a convertible top at the push of a button.

Daimler, BMW, Audi, Porsche and Volkswagen are engaged in cutthroat competition to produce the best cars. At least that's the story often told by auto company CEOs, economists and politicians. It's a narrative about the beneficial effect of the market economy, which is based on competition among companies. But the narrative is wrong, and this is reflected in the convertible top.

Daimler, BMW, Audi, Porsche and Volkswagen did not in fact compete over which company could offer its customers the best top. On the contrary, experts with the five automakers coordinated their actions in numerous meetings. For instance, they determined the maximum speed at which a driver could open or close the top.

"No arms race when it comes to speeds," read the minutes of a meeting in Bad Kissingen. Arguments against an arms race, according to the minutes, were "costs, weight, increasing technological risk and crash relevance." The result of that meeting is that the soft tops on the convertibles sold by Daimler, BMW, Audi, Porsche and Volkswagen can only be opened and closed at speeds of up to 50 kilometers per hour.

It was an agreement that suspended both competition and the market economy. It was reached by the "working group for mechanical attachments." There were many, many other working groups involving the five German automakers, including working groups for braking control systems, seating systems, air suspensions, clutches, gasoline engines and diesel engines. The major issues were discussed and arranged in these groups.

Reporting by DER SPIEGEL into the anti-cartel authorities in Brussels and Bonn, and automakers in Stuttgart, Munich and Wolfsburg, and conversations with current and former executives, provide a previously unknown image of Germany's most important

industry. The conclusion is that Daimler, BMW, Audi, Porsche and Volkswagen often no longer compete with one another. Instead, they secretly cooperate, very closely, in fact, in the same way one would normally expect of the subsidiaries of a single company to work together, as something like a "German Cars Inc." -- or a cartel.

Daimler, Volkswagen, Audi and Porsche have already admitted as much to the European Commission and the German Federal Cartel Office. In a brief dated July 4, 2016, Volkswagen issued what amounts to a voluntary declaration of its "participation in suspected cartel infringements." According to the VW statement, Daimler, BMW, Volkswagen, Audi and Porsche have coordinated matters relating to the development of their vehicles, costs, suppliers and markets "for many years -- at least since the 1990s and to this day."

It is not just a matter of the establishment of an exclusive club of the five German automakers with the goal of attaining economic advantages over the competition. The secret agreements are also detrimental to customers, who buy German vehicles because, among other things, they expect to be getting the best possible products from a technical standpoint. But how can a company produce the best if competition is curbed, and if the engineers stop doing their utmost to outdo the engineers working for other brands?

And then there are the millions of owners of diesel cars. In an almost bizarre way, they too are victims of the German auto cartel. For the first time, there is proof that it was agreements among these five automakers that ultimately ensured that emissions from diesel vehicles were not cleaned as effectively as would have been technically possible. This all began with the cartel of the five automakers.

Diesel buyers are now left with the damage. They face the prospect of no longer being allowed to drive their cars in cities, and of suffering significant losses when selling the vehicles. Shareholders are also among the victims. Penalties for cartel violations weaken the companies in which they hold shares and can lead to declining share prices. Suppliers are also adversely affected, as is almost always the case with cartel agreements. If the five German automakers agree to buy from only one company, others stand no chance of securing orders.

The agreements among the German automakers likely constitute one of the biggest cartel cases in German industrial history. They began in the 1990s and were expanded to include more and more issues, probably in part because industry executives long viewed violations of competition law as harmless rule violations, on a par with parking tickets.

It is only in recent years that the European Commission has begun imposing drastic penalties on companies that secretly collude on pricing or the technology they use. In 2012, manufacturers of cathode ray tubes were ordered to pay 1.5 billion euros in fines. In 2016, a 2.9-billion-euro penalty was imposed on commercial truck manufacturers.

The cartel of German automakers could also face fines in the billions. And the industry's image, which has already suffered considerably from the diesel scandal, will be damaged even further.

The exposure of the club of five strikes the companies at a time when they need all of their strength and financial assets for other things: the transition to electric cars and their transformation into mobility service providers. It is also a time when they are being challenged by new competitors from Silicon Valley and China.

But now VW, Audi, Porsche, Daimler and BMW must first address a problem in their most recent past. It is a painstaking process, because the agreements extend across such a long time period and so many managers were involved.

The development experts at the German auto companies met "regularly several times a year." They met in Stuttgart, Munich, Ingolstadt and Wolfsburg, and at the major auto shows in Geneva, Frankfurt and Paris. There is "the suspicion," as Volkswagen stated in its brief, also speaking on behalf of subsidiaries Audi and Porsche, that there was "behavior in violation of cartel law."

When a car company itself voices the "suspicion" that it may have violated laws, the evidence must be very clear. And it is.

Sometimes the cooperation among Daimler, BMW, Audi, Porsche and Volkswagen worked more effectively than cooperation among various departments within a company. The automakers' experts were assigned to working groups and sub-working groups, classified according to the following development areas: "engine," "car body," "chassis," "electric/electronic" and "total vehicle." Because five brands were involved, the groups were known internally as the "groups of five."

The VW Group's self-incrimination offers a new look at the diesel scandal and its evolution. It also provides a surprising answer to the question of why the German auto industry was only able to comply with emission limits for diesel cars with tricks and deception, and why VW, Audi and Porsche even used fraud as a tool: The manufacturers were not competing to achieve a Vorsprung durch Technik, or "technical edge," as Audi likes to tout in its British and German advertising, by effectively cleaning exhaust gases. On the contrary, they largely removed competition from this area.

At numerous meetings, they coordinated the size of tanks for AdBlue, a urea mixture used to split nitric oxide into its harmless components of water and nitrogen. Large tanks would have been expensive, so Daimler, BMW, Audi and Volkswagen agreed to use small tanks. However, at some point the amount of AdBlue the tanks contained was no longer sufficient to adequately clean exhaust gases.

The European Commission is currently examining the auto cartel case. It has seized records from the participating companies and has begun questioning witnesses. Last Wednesday, DER SPIEGEL extensively questioned the participating companies about the cartel accusations.

BMW stated: "Please understand that we cannot process your extensive list of questions. We do not participate in such speculations."

Daimler responded: "Please understand that, as a rule, we do not comment on speculations."

Volkswagen wrote: "We have no comment on the speculations and presumed circumstances that you have mentioned."

The cartel authorities face a Sisyphean task in their investigation of the auto cartel. There were more than 60 working groups in which the automakers cooperated. "We assume," Volkswagen wrote in its statement to the authorities, "that more than 1,000 relevant meetings took place in the last five years."

More than 60 working groups and more than 1,000 meetings.

At this point, it makes sense to pause for a moment and ask: Excuse us? What exactly was going on in an industry that, for decades, was considered a symbol of the strength of German industry? Weren't the heads of these auto companies constantly pointing out how fantastic the competition was, especially among the German automakers?

Commenting on the fact that Audi, BMW and Mercedes together hold about 80 percent of the global market share in the premium segment, Daimler CEO Dieter Zetsche said that one of the reasons was that "as neighbors, we are constantly stepping on each other's toes. In this sense, competition is an incredibly good thing." BMW CEO Harald Krüger said: "This competition constantly motivates us to achieve excellence." VW CEO Matthias Müller praised the competition among brands. And Audi CEO Rupert Stadler said that competition had "given us all a technological advantage."

Was it all just for show?

Of course there is still competition among German carmakers. Each of them strives to ensure that its latest model has either the most comfortable or the sportiest chassis. Each of them aims to design an especially safe vehicle that performs well in crash tests. And each company wants to be at the forefront when it comes to offering the first fully self-driving car.

There are cases in which the German carmakers do officially work together. For instance, Mercedes-Benz and BMW cooperate in buying certain auto parts. This is allowed if the

parts are not relevant to competition, that is, if they do not constitute a distinguishing feature between a BMW and a Mercedes -- windshield wiper blades, for example.

But beyond this known cooperation, apparently the companies, in their groups of five, secretly shut out the competition in many areas of vehicle development for years, thereby violating the basic principle of the market economy.

This has already come back to haunt them, and in dramatic fashion. The diesel scandal would not have taken shape as it did, and perhaps not even at all, without the agreements among German automakers. It is not the work of a few criminal managers in the Volkswagen Group, but ultimately the result of secret agreements within the entire German automobile industry. DER SPIEGEL has already reported on the initial signs of collusion.

The companies have been coordinating their efforts in numerous meetings and conference calls since 2006. There were agendas and minutes of these meetings. And sometimes the participants even joked about the aspect of confidentiality. One Audi email, for example, reads: "Hello everyone, here is the information on the 'secret' meeting in Munich."

The starting point was the debate over the increase in the greenhouse gas $CO_2$ and the resulting global-warming. Calls for limits on $CO_2$ emissions became more and more vocal worldwide. After heavy industry and energy producers, the automobile industry also came under fire.

A Japanese carmaker had a response to the criticism. Toyota was already selling vehicles with hybrid drives, in which a classic combustion engine is supported by an electric motor. Fuel consumption and, as a result, $CO_2$ emissions declined considerably. It was considered a pioneering technology. The European Commission, under then President José Manuel Barroso, even discussed imposing a mandatory quota for hybrid drives.

The German automobile industry had nothing comparable to offer in this area. Instead, it chose to back the more than 100-year-old diesel technology. Diesel engines, which emit less $CO_2$ than gasoline engines, were to become their answer to climate change.

**How Collusion Created the Diesel Scandal**

But a diesel engine has one drawback. It produces nitric oxides, which contribute to air pollution, especially in urban areas. Lawmakers decided to reduce nitric oxide limits. Officials in the United States threatened to withhold approval of large Daimler and Audi models. This was probably one of the reasons the five German automakers decided to go on the offensive. Under the motto "clean diesel," nitric oxide emissions were to be reduced with a technology that had long been used in trucks, namely the injection of urea.

But this realization did not trigger a race among Daimler, BMW, Audi and Volkswagen over which company could employ the technology in its vehicle faster and more effectively than the others. Instead, the developers did what they had done so often before: They discussed the issue at length in their working groups.

They focused on harmonizing the various developments of the individual manufacturers. A review of the situation had shown that the individual carmakers were using different tank sizes for AdBlue. This was absurd, the working group of chassis managers concluded at a meeting in Sindelfingen on April 5, 2006. According to a report, the companies urgently needed a "coordinated approach" on tank sizes. It was unacceptable that each manufacturer simply did as it pleased when it came to this issue.

There is a reason for the agitation among the chassis managers: The tank, a simple plastic part, performs a key function in cleaning nitric oxides. The larger the tank, the more AdBlue can be injected, and the more effectively nitric oxides can be reduced. This reduces the number of times the driver has to refill the AdBlue tank. These are the advantages of a large tank. It would also make it easier to comply with stricter nitric oxide limits, not just on the test bench but also on the road.

But the large tank also has its drawbacks. It is more expensive than a small tank and takes up more room. This was why the sales experts opposed the use of a large tank. They preferred to use the space for the loudspeakers of high-end stereo systems, which could be sold to customers as expensive options.

The managers of the German automakers quickly agreed that it made sense to coordinate their efforts. If AdBlue injection were to become the technology of the future, millions of plastic tanks, pumps and brackets would soon be installed in vehicles. If the companies agreed on the tank size, they could "save up to 80 euros per vehicle," according to a presentation by the working group.

The size of the tanks and the manufacturers' related diesel strategy became an ongoing topic in the working groups. A first fundamental decision was reached in April 2006, when the heads of development decided to limit the size of the AdBlue tanks in the future. According to a VW email, it was agreed that AdBlue tanks with a "target size of 17 to 23 liters" would be developed for Europe. If at all possible, the tanks were to be produced by only two manufacturers and designed so that customers would not have to refill them.

But the carmakers appeared not to be overly committed to this first guideline. In October 2007, the companies' development heads met to discuss the same issue. Audi had prepared an overview of all tank sizes being used in the cartel.

It showed that in 2007 Daimler, Audi, VW and BMW had installed tanks with volumes of "between 17 and 35 liters." This resulted in "ranges of between 16,000 and 30,000 kilometers," according to the document. The managers found fault with the fact that the

automakers could not even agree on a single manufacturer for the tanks. For this reason, there was an "urgent need for cooperation among the companies. A uniform escalation logic should be agreed to," according to the minutes of the meeting. To ensure that nothing would go wrong, the individuals responsible for the next steps were named: "The responsible individuals are, first, the drive managers and, second, the chassis managers."

These individuals did in fact apply pressure. After several meetings, Daimler, Audi, VW and BMW agreed, in September 2008, to an 8-liter tank for all vehicles. The arguments were: It was lightweight, didn't cost much and left enough space for golf bags in the trunk. The managers were determined not to scare away customers.

The only problem is that eight liters of AdBlue are not even enough for a range of 6,000 kilometers, provided the manufacturers wanted to clean exhaust gases as required by regulations.

In its brief, Volkswagen informed the European Commission that top management became involved at this point. "An internal Audi presentation resulted in a commitment by German automobile manufacturers at the executive level."

The decision to introduce the small tanks led to initial doubts, especially in the departments in charge of vehicle licensing. This was the phase in which U.S. regulators were causing problems for the car companies. They demanded that the tanks contain enough urea to ensure that they would only have to be refilled during an inspection after about 16,000 kilometers. They were unwilling to accept the possibility that the tanks could be refilled between inspection dates, and they even threatened to stop approving the vehicles.

The automakers responded with irritation. A dispute erupted among the various departments at each company, and there were also heated debates in the secret group-of-five meetings. To satisfy the U.S. requirements, "a minimum tank volume of 19 liters" was needed at average AdBlue consumption levels," read a document prepared by Audi. Daimler, VW and BMW concurred.

In contrast, the companies' marketing departments felt that tanks of that size were too heavy and too large. "These conflicting goals," the Audi managers wrote in a document, had to be resolved "across the board." They also stated that a "coordinated scenario for the future" was urgently needed.

This finally happened in June 2010, when the companies agreed to introduce smaller tanks. The marketing and sales departments had prevailed. The 8-liter target size was to remain the standard in Europe, while 16-liter tanks were planned for the U.S. market. Audi was permitted to install somewhat larger tanks in some of its models.

With the introduction of stricter environmental regulations in the United States and Europe, the amount of AdBlue required to comply with legal limits also increased. The planned introduction of Euronorm 6, according to a March 2011 report by the relevant strategy group, would lead to an "increase in AdBlue consumption of up to 50 percent." This meant that the tanks were much too small. No one could expect customers to be reminded to refill the urea mixture every 2,000 to 3,000 kilometers.

None of the players hit upon the obvious idea of installing larger tanks, thereby attaining the competitive advantage of being able to market cleaner cars. On the contrary. In a May 2014 email, Audi urgently warned against any company going it alone. The need to inject larger and larger amounts of AdBlue into the exhaust gas system, Audi wrote, could "expand into an arms race with regard to tank sizes, which we should continue to avoid at all costs."

If one manufacturer had installed larger AdBlue tanks, licensing and regulatory authorities would probably have become suspicious. The obvious question would have been why that one company's vehicles needed so much more urea to clean the exhaust gases, while the other manufacturers' cars supposedly managed with significantly less AdBlue.

It was something the companies were unwilling to risk. Some had already begun to deceive licensing authorities and customers about the true exhaust emissions coming from their cars. VW installed software that detected when a car was in a testing facility and injected a sufficient amount of AdBlue during that short period of time. Audi used similar software.

US authorities discovered the deception in September 2015. The Volkswagen Group had to create reserves of more than €20 billion for fines, vehicle improvements and compensation for customers in the United States. In Europe, shareholders and car owners also demanded billions in compensation.

The Stuttgart public prosecutor's office is investigating Daimler, which is suspected of having used similar software. Last week, the Stuttgart-based company announced it was recalling 3 million cars for a software update to improve emissions control in diesel models. This is unlikely to satisfy the public prosecutor's office and the U.S. authorities, which are also investigating Daimler.

The collusion over diesel engines is the most spectacular case, but only one of many in which the five German carmakers may have violated cartel law. The system of collusion encompassed almost all areas of automobile development.

As Volkswagen noted in its brief to the cartel authorities, there as an "exchange of internal, competitively sensitive technical data." The five manufacturers had jointly

established "technical standards" and had agreed to use "only certain technical solutions" in new vehicles.

None of the manufacturers was to step so far ahead of the others with a new model that they would encounter problems in selling their vehicles. If a manufacturer introduced groundbreaking technology, the others had to be capable of also offering their customers the technology relatively quickly.

It is standard practice in the industry to analyze competitors' vehicles. The automakers buy cars, drive them and sometimes dismantle them. This is a complex and expensive undertaking.

The members of the group of five helped each other to facilitate these comparisons by exchanging data on such variables as the "driving resistance coefficient." The Third-Party-Motor Analysis working group oversaw this effort. According to one employee, "the 'give and take' motto is correct and, in this manner, is also experienced in a friendly manner within the working group."

This may not have posed a problem under cartel law if all automakers had been given access to the data, including competitors from France, Italy, Japan and the United States. But the members of the German group of five wanted it to remain an exclusive group. Inquiries from Jaguar, Volvo, Renault and Fiat were rejected.

Not all members of the Third-Party-Motor Analysis working group were completely comfortable with the situation. A rejected manufacturer could file a complaint with the cartel office, a member of the group warned. As a precaution, Daimler had "had its legal advisers examine the issue," a VW manager wrote in an email. "The law firm that was hired expressed considerable concerns that problems could arise if a competitor did in fact file a complaint."

The participating managers repeatedly recognized that their agreements could be illegal. The Diesel Engines working group removed the last two pages of a September 2011 presentation, which related to the development of a special sensor. The change had to do with feedback from Daimler. An email reads: "A review of the document with the legal department led to serious concerns in terms of cartel law."

The subject was discussed at a meeting of the working group in Bayreuth on Sept. 14. According to a memo about the meeting, the BMW representative had asked: "Who would be interested in proving that we are in violation of cartel law?" The Daimler representative responded: "Mainly the exchange supervisory authority." He added that Daimler had also engaged "outside auditors who have access to everything." Another participant said: "Our agreement that a sensor needs to be developed is not the critical issue, but the joint definition of the supplier is."

It was critical, but things went smoothly for a long time, enabling the German auto industry to continue to wheel and deal in "friendly collaboration."

But there were also occasional conflicts. As one memo reads: "The Daimler representatives in the working group on the after-treatment of exhaust gases continue to leave much to be desired."

The collusion was also problematic in terms of cartel law when the group of five exchanged information about major suppliers. Beginning on Sept. 24, 2013, representatives of the automakers met within the Pneumatic Suspension working group to "discuss supplier performance." The discussions revolved around ZF, one of the largest suppliers to the industry. Daimler was critical of the company, citing its poor performance in the processing of electronically transmitted orders and stating that it only addressed problems when put under pressure. The Porsche representative added that the quality of ZF's products was also poor.

Such agreements could deprive individual suppliers of the opportunity to receive orders from Daimler, BMW, Audi, Porsche and Volkswagen. This too could be in violation of cartel law.

Given the large number of working groups, the employees sometimes lost their ability to consider the bigger picture. Members of the Clutch working group discussed when the parking lock should be activated in a vehicle. According to the minutes of a meeting in Munich, an attendee suggested clarifying "whether a Standstill Management working group exists yet."

The individual cases described in the Volkswagen brief reveal that the German automakers live in two worlds. The one world, the hidden one, is characterized by a lively "give and take." In the other world, the one on display at auto shows, the automakers act as if they were in bitter competition with each other.

At the major shows in Paris, Frankfurt, Geneva, Detroit and Tokyo, the executives often deride their competitors' models, though they are usually quoted anonymously. Referring to a Daimler model, a VW executive says: "It has the clearance of a truck." Commenting on a new Audi, a BMW developer says: "It already looks as old as its predecessor." And a Mercedes manager says the following about a Volkswagen: "You're better off buying a Skoda. It's €3,000 cheaper and a better car."

The fact that Daimler and Volkswagen are now offering a detailed look at this practice with their reports to the cartel authorities is not voluntary. The companies were under pressure, fearing that their syndicate would be exposed.

In connection with investigations against a steel cartel, the Federal Cartel Office conducted searches at six companies on June 23, 2016. The officials seized computers,

hard drives and files, which contained something the investors call "bycatch": Evidence of violations in a completely different case. It was a case they had been completely unaware of until then: the auto cartel.

After that, Volkswagen searched all of its own records that could be related to the case and made them available to the cartel authorities in Brussels and Bonn. Insight or remorse were certainly not motivating factors. The company wanted to take advantage of its last opportunity to emerge from the affair unpunished -- by revealing everything and blowing the whistle on its old partners.

In antitrust proceedings, companies that are involved may have the opportunity to offer themselves as key witnesses. The European Commission and the Federal Cartel Office often provide immunity from prosecution to companies that disclose their activities.

This case is likely to involve a lot of money -- several billion euros in potential fines.

A year ago, truck manufacturers Daimler, Volvo/Renault, Iveco and DAF were ordered to pay €2.9 billion in fines, because the companies had coordinated pricing for their trucks for years. Only one company in the industry got off scot-free: MAN. Although the Munich-based company was also part of the truck cartel, it had offered its services as a key witness early on.

Volkswagen is now hoping for similar treatment. The company is also asking for a "waiver, or alternatively a reduction of the fine that would otherwise be imposed" for its subsidiaries Porsche and Audi.

The only problem is that Daimler has also come clean to the authorities. Only the authorities know which of the two companies was quicker in the art of self-incrimination. It may be a matter of days or even hours that will decide whether one of these companies will eventually be slapped with a fine of €1 billion, a half-billion or perhaps nothing at all.

The issue is clearly regulated in German cartel law, which states that the greatest penalty reduction is granted to the company that outed itself first and most extensively documents the violations.

In this case, Daimler and Volkswagen are truly in competition with one another.

Translated from the German by Christopher Sultan

**URL:**

http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html

**Related SPIEGEL ONLINE links:**

The Electric Shock: E-Mobility Gets Existential for German Carmakers (01/21/2017)
http://www.spiegel.de/international/business/german-carmakers-prepare-for-e-mobility-future-a-1132476.html

The Way Forward after Dieselgate: 'We Will Do Everything to Bring VW Back' (10/26/2016)
http://www.spiegel.de/international/germany/vw-and-dieselgate-wolfgang-porsche-and-hans-michel-piech-a-1117984.html

Dieselgate in Europe: How Officials Ignored Years of Emissions Evidence (08/19/2016)
http://www.spiegel.de/international/business/volkswagen-how-officials-ignored-years-of-emissions-evidence-a-1108325.html

Diesel Emissions: EU Commission Has Known for Years about Manipluation (07/15/2016)
http://www.spiegel.de/international/business/commission-has-long-known-of-diesel-emissions-manipulation-a-1103249.html

© SPIEGEL ONLINE 2017
All Rights Reserved
Reproduction only allowed with the permission of SPIEGELnet GmbH